IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

SHELBY R. KUHN,
   Plaintiff,

v.            Civil Action No. 3:05CV126

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,
   Defendant.

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

## I. Procedural History

Shelby R. Kuhn("Plaintiff") filed applications for DIB and SSI on November 19, 2003 (protective filing date), alleging disability beginning September 25, 2003, due to severe asthma and severe allergies (R. 71, 81, 221). Both applications were denied initially and on reconsideration (R. 54, 224, 230). Plaintiff requested a hearing, which Administrative Law Judge ("ALJ") Karl Alexander held on March 16, 2005 (R. 31). Plaintiff, represented by counsel, was present and testified, as did Vocational Expert Tim Mahler ("VE") (R. 285). On June 27, 2005, the ALJ issued an unfavorable decision (R. 23). The Appeals Council denied Plaintiff's request for review (R. 4), rendering the ALJ's decision the final decision of the Commissioner.

## II. Statement of Facts

Shelby R. Kuhn ("Plaintiff") was born on December 27, 1968, and was 36 years old at the time of the administrative hearing (R. 35). She graduated from high school and beauty school and has past work experience as a beautician, fast food restaurant manager, bank teller, and grocery store deli clerk (R. 36-38).

The first medical record available is dated May 12, 2003, signed by Dr. David Goetz, M.D. PhD, an allergist/immunologist (R. 122, 123). That record states that Plaintiff last saw Dr. Goetz on December 12, 2001, 18 months earlier. It notes she had been directed to return in early 2002, but had not. It notes that her medications had been changed since she was last seen and that she had had a "recent asthma exacerbation." She had been provided with a home Nebulizer. She needed all of her medications renewed, and was not on full doses. She was "having wheezing, cough intermittently," and a problem with acid reflux "even on Nexium." Her "established diagnoses" were listed as seasonal allergic rhinitis, perennial allergic rhinitis, asthma, food allergies, and GERD. Her only new diagnosis was "needs full compliance [with] meds and f/u." The treatment plan was to continue present management, and to "encourage full compliance [with] meds."

Plaintiff next presented to Dr. Goetz on July 30, 2003 (R. 124). The doctor noted that she had "severe obstruction." Her FVC was at 81% and her FEV1 was at 62%. Dr. Goetz noted Plaintiff's asthma was again at her previous best on medications. She was having increased GERD symptoms, however, despite Nexium. He referred her for a gastroenterology consultation, and continued her on her same treatment.

Plaintiff's alleged onset date is September 25, 2003, the date she alleges she became unable to work (R. 81). She had been working as a deli clerk in a grocery store until that time. In her

Disability Report, Plaintiff stated she stopped working because her asthma became very bad and her oxygen level dropped below 90. Her doctor had her on breathing treatment every four hours, and did not want her to be in contact with people or food. She reported being very out of breath, and being unable "even to take care of kids, let alone work." At her job she was required to take care of customers, clean, cook, put away stock and supplies, use electric slicers, and put truck orders away (R. 82). The job required her to walk 8 hours a day, stand 8 hours a day, climb 1-2 hours a day, and lift "big pieces of meat and cheese" and heavy boxes, carrying them 20-30 feet "all day long." She estimated the heaviest weight she lifted was 50 pounds. She stated that she first saw Dr. Clarke on September 25, 2003, and he put her on steroids and antibiotics for her sinus infection and told her not to work. She was also put on a new inhaler by Dr. Goetz.

On October 1, 2003, Plaintiff called Dr. Goetz's office and said she had not been seen by the gastroenterologist because she had been 15 minutes late and he refused to reschedule (R. 121). Plaintiff asked for a referral to another gastroenterologist, which was done.

An October 8, 2003, CT of the sinuses demonstrated sinus disease worse on the left than the right (R. 115).

On October 27, 2003, Plaintiff presented to Dr. Goetz with "recent asthma exacerbation associated with acute sinusitis" (R. 119). The sinusitis had been treated, and she was "recovering slowly." Her FVC was at 74% and FEV1 was at 52%. The doctor noted Plaintiff had significant improvement with Foradil, and was slowly improving from acute sinusitis. She was considered a candidate for a new medication, Xolair.

On November 20, 2003, Plaintiff presented to Dr. Goetz with complaints of an inability to tolerate the smallest irritant, such as smoke or dust (R. 118). Even with Foradil she needed to stop

frequently to rest. She was interested in starting Xolair treatment. The doctor believed she would

have a good response. Dr. Clarke extended Plaintiff's "off work" excuse to December 1, 2003,

advised her to pursue her gastroenterological evaluation, and otherwise continued her current

management.

On December 1, 2003, Dr. Goetz wrote to Dr. Clarke, stating:

> I agree that Xolair is the next best approach to Ms. Kuhn's poorly-
> responsive asthma. Her IgE-331 IU/ml and medical status were
> transmitted to Caremark on 11/20/03 to initiate Xolair treatment.

> Currently, Caremark is communicating with Ms. Kuhn to work
> through the one "sticking point" – the monthly copay of $546 (30%
> of the cost of Xolair). I hope we will be able to complete the
> arrangements for Xolair treatment in the next several weeks.

(R. 117).

Plaintiff filed her Disability Report on December 11, 2003, stating, in part:

> I am filing for this [disability] because I have a very hard time doing
> simple tasks around the house, even taking care of my kids at times
> is difficult. Most of the time to climb my stairs at home to just go to
> the bathroom, I have to stop after reaching the top (sometimes before)
> to catch my breath. I don't think at this point in my life I am able to
> go back to work (even part time) and take care of my family full time.
> I have such severe allergies to all surroundings that every time I am
> exposed to these my asthma gets real bad. I have problems every day
> with my asthma and being exposed to the surroundings makes it a lot
> worse. There are times my oxygen level goes way below normal and
> I feel as if I am fighting for my life. I have tried allergy shots before,
> until I went into anaphylactic shock driving home and thinking I
> wasn't going to make it so these are not even an option anymore. At
> this time it has come to where myself and my doctors (Clarke and
> Goetz) think it would be in my best interest to retire my position as
> a worker being out in and around the public as much as possible to
> avoid thing I am allergic to and germs I may pick up. Since these
> things make me flare up severely making it hard to fight off anything
> I get in contact with. Please take all of this into consideration and
> approve me so I can have a healthier life and be able to take care of
> my children the way I should be able to.

4

(R. 88-89).

On December 26, 2003, Plaintiff submitted her Activities of Daily Living form (R. 93). Where asked if anyone depended on her for care, she stated: "Yes. I have 3 girls ages 12, 9, 2. I have to take care of their everyday needs." She stated she did not sleep well because of her breathing problems, but did not take naps during the day, stating: "I can't. I have a 26 month old I have to care for." She needed no help with any of her personal needs. She shopped for food, clothing, books, and medication, doing it "as quick as possible," because she could not walk at a fast pace or long distances without becoming short-winded. She did not have much energy. She drove, and no one went with her.

Plaintiff stated her hobbies and interests included swimming, shopping, walking, and bike riding and that she did these twice a week, but also stated that all her hobbies and interests had "pretty much been stopped" because she did not have the air (R. 94). Changes in the weather were bad and it hurt to breathe outside air during cold weather.

Plaintiff stated she prepared breakfast, lunch, and dinner for her family. Breakfast consisted of eggs, toast, oats, but "sometimes just cold cereal because I don't feel well." For lunch she prepared sandwiches, hot dogs, french fries, and macaroni and cheese. For dinner she prepared full course meals, but "sometimes something more simple." She stated this was a change since her condition began because "some days I find us just eating what we can find for I don't have the strength or time for running older kids" (R. 95).

Under Daily Activities, Plaintiff stated that she did the laundry, vacuumed, dusted furniture, paid bills, performed child care, mopped floors, washed dishes, managed the bank accounts, and ran

errands (R. 95). The only activities she did not check off were household repairs, lawn care, washing the car, taking out the trash, and mending clothes. She stated that her husband helped when he could "but he is usually at work." She also said the "older kids" helped pick things up and "run the sweeper some," but most of the time after school they had homework or a test to study for, or ball games to attend. "Then it's time for bed, leaving me to see that all gets done." She concluded: "A good many days I find it very complicated to get my everyday chores done. There are days I get nothing done."

Plaintiff stated she visited with relatives 1-2 times a week for 1-4 hours at a time, and visited with friends 3-4 times a month. She walked out to get the newspaper every day, and every evening she had to take her daughter to cheerleading practice and then pick her up. She went to the store 1-2 times a week. She had to sit and rest quite often throughout the day.

On January 20, 2004, State agency reviewing physician Fulvio Franyutti, M.D. completed a physical residual functional capacity assessment ("RFC") of Plaintiff, based on her severe allergies and asthma (R. 125). He opined she could work at the light exertional level with no climbing of ladders, ropes or scaffolds, and only occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, or crawling. She should avoid concentrated exposure to extreme cold and heat and fumes, odors, dusts, gases, poor ventilation, and hazards, and all exposure to machinery and heights.

Plaintiff was denied disability at the initial determination level on January 21, 2004 (R. 54).

Plaintiff presented to Dr. Clarke on January 22, 2004, for a follow up (R. 134). The doctor noted that Plaintiff needed to be on Xolair but the copay was still a problem, so he was attempting to get her on an assistance program. Plaintiff reported "a lot of sinus pressure." Dr. Clarke noted Plaintiff had not quit her job but had not "really been to work because she is totally disabled." He

noted that disability "was advised" by both he and Dr. Goetz. Plaintiff reported no additional symptoms that day except for the sinus congestion. She was still gaining a little bit of weight and was still tired going up and down stairs, but her lungs had been "somewhat stable." On exam, her lungs had expiratory wheezes and prolonged expiratory phase but these were noted by the doctor to be "better than usual." He diagnosed sinusitis.

Plaintiff presented to Dr. Clarke on February 16, 2004, for a follow up (R. 133). Plaintiff had not gotten approval through the pharmacy to pay the co-pay for Xolair, but she was "maintaining." She had lost a little weight because she had not had to use steroids. She reported being severely dyspneic and short of breath, and noted she had been denied disability.

A March 4, 2004, Pulmonary Function Test ("PFT") indicated Plaintiff had a mild obstructive pulmonary impairment (R. 144). Her FEV1 was 1.47. There was evidence of a significant component of small airway obstruction which may evidence a degree of reversibility.

That same date Plaintiff reported she was unable to obtain the Xolair (R. 143). She was coughing and wheezing. She had been on repeated steroids since November 2003. Her management of asthma was worse and the side effects of the increased steroids were more severe.

On March 8, 2004, Plaintiff reported on her appeal of her disability that her condition had worsened since about January 15, 2004, and it was now "extremely difficult to breathe" (R. 99). She stated her lungs did not fill to capacity, making her unable to do anything, which in turn made her life very stressful. She reported she could no longer take care of her home and children and did no housework. Her husband and family had to do everything, her friends took her children to games, and her mother did all the shopping. She no longer did any activities or hobbies (R. 103). On that same form, Plaintiff objected to the finding by SSA that she had been a bank teller, stating that she

7

was a "food processor, food preparer to include cleaner." She then stated:

> A brief description of my duties are cleaning using strong chemicals, unloading large containers of product, unloading large containers of supplies. Working in and out of extreme cold and hot conditions. Also dealing with customer service.

(R. 104-105).

On March 17, 2004, Plaintiff presented to nurse practitioner Mary Watson with complaints of achiness, sore throat and sore ears since the day before (R. 136). Her voice was very nasal and her weight was up nine pounds from one month earlier. Her lungs were "pretty clear." Her pulse Ox was 96% and breathing was non-labored. She was diagnosed with sinusitis and asthma, and prescribed an antibiotic.

On April 9, 2004, it was noted that Plaintiff had not started a new medication because it cost approximately $150.00 per month (R. 142). The doctor advised her to start the medication but to take it only every other day so it would last two months. Despite not starting the medication, the doctor noted Plaintiff had improved pulmonary function studies.

On May 7, 2004, Plaintiff presented to Dr. Ellen Post, M.D. for a follow up of her asthma (R. 181). Plaintiff reported an exacerbation during the past week, while at a church function with her daughter at a new church. She was not sure if there had been dust or mold there, but it triggered an asthma exacerbation and she had to leave the building. It lasted a few hours and required "a couple of" nebulizer treatments but then went away. She'd been feeling fine ever since.

Plaintiff told the doctor her husband continued to smoke indoors despite that fact that Plaintiff and two of her daughters had significant asthma. She otherwise had no complaints. She was concerned about her weight, stating she could not do much exercise because it made her breathing bad. On examination, her lungs had no wheezes or crackles. She was diagnosed with

asthma, moderate persistent, and overweight. She had gotten approval for the Xolair injections to start the next week. The doctor put her on a medication to stimulate her metabolism so she could lose weight.

Plaintiff saw Dr. Clarke that same date. He examined her and found her lungs had expiratory wheezes "as always" and some intracostal muscle use. Plaintiff told him she had been sick about a week and a half earlier, but "got over it without steroids, stayed in the house and just used her inhalers."

On May 11, 2004, Plaintiff presented to Dr. Goetz for follow up (R. 204). It was noted her respiratories [sic] were unchanged to "somewhat more problematic with occasional use of Albuterol." She had an occasional cough with no wheezes, rales or rhonchi. She started Xolair shots that same day.

A June 2, 2004, study indicated Plaintiff's diffusion capacity was mildly reduced and room air arterial blood gases were within normal limits (R. 158).

On June 7, 2004, Plaintiff presented to Dr. Clarke for a follow up (R. 179). She reported "doing much better now that she remains off work." She had had her first dose of Xolair which improved her breathing function "a lot." PFT's and blood gas studies showed a low bicarb and severe restrictions of her functional capacity which the doctor found was "consistent with her problem." Otherwise she was doing well. She had lost some weight and her breathing was somewhat better and her stamina was better. She was "still taking a leave from work." Disability had not come through yet, but she was going through the process. Lungs had decreased breath sounds in the bases but were somewhat improved. She had a prolonged expiratory phase, and mild expiratory wheeze. She had lost seven pounds, which helped.

A June 11, 2004, PFT showed mild obstructive pulmonary impairment (R. 202). Dr. Goetz opined that Plaintiff was stable. She was returning for her second Xolair injection. She had an occasional cough and occasional use of Novotril. On exam she had no cough, no wheezes, no rales and no rhonchi.

On June 22, 2004, State agency reviewing physician Thomas Lauderman, D.O. completed an RFC opining that Plaintiff could perform work at the light exertional level, with only occasional posturals (R. 152). She must avoid concentrated exposure to extreme cold and heat, wetness, humidity, and hazards, and must avoid even moderate exposure to fumes, odors, dusts, gases, and poor ventilation. Dr. Lauderman found Plaintiff was "partially credible." He noted Plaintiff's diagnosis of severe persistent asthma on maximum treatment in October 2003; her diagnosis of severe asthma in January 2004; her FEV1 of 1.47 and FVC of 2.53 on March 4, 2004; her "improved PFT's" on April 9, 2004; her use of a nebulizer every four hours; her normal labs; her severe GERD with no weight loss; and her blood gas studies. Dr. Lauderman noted Dr. Clarke's opinion of January 22, 2004, that Plaintiff was "totally disabled," and her doctors' advice that she apply for disability, but disagreed with their conclusion that Plaintiff was totally disabled.

Plaintiff was denied disability at the reconsideration level on June 22, 2004 (R. 55).

A June 28, 2004, PFT showed mild obstructive pulmonary impairment (R. 200). Dr. Goetz found Plaintiff tolerated the Xolair well. Plaintiff told Dr. Goetz she could "tolerate cats at relatives's home!" (Exclamation in original). She had no cough, no wheezes, rales or rhonchi. Although there was little PFT change, the doctor found Plaintiff's clinical symptoms had improved.

On July 7, 2004, Plaintiff presented to Dr. Clarke for a follow up (R. 177). She reported being denied social security disability. She continued to get Xolair therapy. Her FEV had not

improved in the smaller airways, but her resting breathing had "really improved." The doctor noted Plaintiff had not had a severe exacerbation, and concluded the Xolair was helping decrease her triggers. Overall, he found she still had severe asthma and had to avoid environmental agents and "really cannot go to work and stress herself or she will get very short of breath." The doctor opined she was totally disabled and met AMA criteria for total disability. Upon examination, her lungs had decreased breath sounds at the bases and prolonged expiratory phase with expiratory wheezes.

On July 12, 2004, Plaintiff appealed her disability denial and requested a hearing before an ALJ, stating there had been no change for better or worse since her last disability report of March 8, 2004 (R. 107).

A July 15, 2004, pulmonary function report showed Plaintiff had a mild obstructive pulmonary impairment (R. 198). Dr. Goetz found Plaintiff had had no exacerbation, and her GERD was stable (R. 197). She continued to tolerate cats in the environment. She had no cough, no wheezes, no rales, and no rhonchi. Dr. Goetz found "suggestions of improvement in allergies and asthma. Best PFT's in 2 yrs."

On August 17, 2004, Plaintiff telephoned Dr. Goetz's office stating she had been passing out for two to three weeks, two times per week (R. 196). She was advised to go to the emergency room.

On August 20, 2004, Plaintiff presented to nurse practitioner Mary Watson to follow up on a syncopal episode a few days earlier (R. 176). Plaintiff reported that her children had been fighting at the time, and she got angry at them. She was yelling. She passed out. Upon examination, her lungs were clear and her Pulse Ox was 99%.

On August 25, 2004, Plaintiff called Dr. Goetz's office and stated that doctors at the ER thought her blackout may have been a seizure and she was scheduled for an EKG and MRI. She had

11

been advised to stop the Xolair treatments until it could be determined what had caused her syncopal episode.

On September 3, 2004, Plaintiff followed up with Dr. Clarke for complaints of "shortness of breath for the last 2 days and a lot of drainage." The doctor believed Plaintiff's syncopal episode had been due to hyperventilation. He noted Plaintiff had been very upset at her kids at the time, was yelling out loud at her children, and was hyperventilating. The doctor did not recommend further work-up after the MRI, which was negative.

Upon examination, Plaintiff's lungs showed expiratory wheezes, inspiratory wheezes, and anterior rhonchi in all lungs fields, with decreased breath sounds in the bases. The doctor believed Plaintiff "was refluxing a little bit more," and noted she was "under a lot more stress." He supported "federal disability."

A September 9, 2004, MRI of the brain for history of syncope was negative (R. 182).

On October 15, 2004, Plaintiff called Dr. Goetz's office and stated she had been cleared to start the Xolair shots again. It was noted the "seizures" were "mild and stress related and Doctor increased Zoloft." She had been "okay" for the past three or four weeks and wanted to restart her shots.

On October 22, 2004, Plaintiff presented to Dr. Goetz for follow up (R. 193). Her asthma, allergies, and GERD had been worse since she had stopped the Xolair. Her PFT's were still stable, however. She had no cough, wheezes, rales, or rhonchi. She restarted her Xolair shots that day.

A PFT that same day showed only "possible early obstructive pulmonary impairment," with a normal FVC and FEV1. (R. 192). Those findings could have been "due to a mild degree of small airway disease and/or the earliest stages of emphysema, and may be reversible."

12

A November 22, 2004, PFT showed mild obstructive pulmonary impairment. Dr. Goetz noted Plaintiff had missed her last dose of Xolair. It had been a month since her last dose, and she was supposed to have one every two weeks (R. 189). She still had no wheezes, rales or rhonchi, however. The doctor encouraged full compliance with medications.

On November 23, 2004, Plaintiff presented to Dr. Clarke with "a significant [past medical history] of severe ongoing asthma." It was noted she had "received nothing on disability at this point." She was very depressed and not sleeping, and was getting "very short fused and cranky." The doctor increased Plaintiff's Zoloft. Her lungs showed expiratory and inspiratory wheezes throughout all lung fields, and decreased breath sounds in the bases.

On December 8, 2004, Plaintiff presented to Dr. Goetz for her scheduled Xolair shot (R. 188). The doctor encouraged adherence to her schedule for best effect.

On December 21, 2004, Mary Beth Farina-Mazure, a nurse practitioner, saw Plaintiff in the Digestive Disease Clinic regarding her GERD (R. 167). Plaintiff reported a long history of acid reflux with occasional nausea but no vomiting, and heartburn on a daily basis. She had no nocturnal symptoms but reflux during the day at least 4-5 times per week. Plaintiff reported shortness of breath related to her asthma usually brought on by changes in weather, exertion, and allergies. She used her rescue inhaler at least three times per week. She had no hemoptysis and no chronic cough. She had had pneumonia three years earlier, and bronchitis two years earlier. Physical exam showed Plaintiff's lungs were clear on auscultation, lateral excursion, and there was no labor to respirations.

The doctor scheduled Plaintiff for an EGD to rule out ulcers and H. Pylori, and continued her on her present medication. She explained to Plaintiff the proper use of her medications for GERD, that being that she must take them ½ hour before breakfast and dinner for them to work effectively.

Plaintiff stated that she understood. There is no further record of an EGD.

A December 28, 2004, PFT showed mild obstructive pulmonary impairment. Plaintiff presented to Dr. Goetz for a follow up that same day (R. 186). He noted she was clinically unchanged but had had no asthma problems in the last 20 days. She was tolerating the Xolair well and her GERD was stable. She was on schedule with her Xolair injections. There were no changes in PFT's (FVC 69%; FEV1 47%, and FEF 25-75 22%.)

On January 17, 2005, Plaintiff presented to Dr. Clarke for follow up (R. 170). She reported an increase of shortness of breath due to the onset of cold weather. The increase in Zoloft had really helped her sleep and her mood and the Adipex was helping her appetite, so that she had lost another two pounds. She had had no more syncopal episodes. Her lungs showed prolonged expiratory phase and mild expiratory wheezes. Dr. Clarke diagnosed severe asthma, "which tends to be non-infective at this time." He believed, however, she would begin to have more "breakthroughs" because she had been unable to get Xolair due to a problem with co-payments.

SSA mailed out a Notice of Hearing on January 27, 2005, scheduling Plaintiff's hearing for March 16, 2005 (R. 24).

On February 7, 2005, Dr. Goetz wrote to Plaintiff's counsel as follows:

I first consulted with Dr. Clarke concerning Ms. Shelby Kuhn's medical conditions on 2 Jan 01. At that time she already had severe persistent asthma. Additional diagnoses included anaphylaxis with previous attempts at allergenic vaccine therapy, allergic rhinitis, severe GERD, and food allergies.

Despite maximal medical treatments for both asthma and for GERD, as well as referral to gastroenterology, asthma has remained in poor control. FEV1 is usually in the range of 50%, and Ms. Kuhn has required multiple courses of oral steroids for asthma control. On 11 May 04 she was started on Xolair, but sporadic administration led to an inadequate trial of therapy.

Ms. Kuhn's asthma remains poor controlled [sic] in the severe persistent category.

14

(R. 183).

On February 8, 2005, Dr. Clarke wrote a letter to Plaintiff's counsel, stating:

I have been treating Ms. Kuhn for approximately four years, and Ms. Kuhn's current diagnosis includes severe IGE mediated [sic?] asthma, which requires special Mono Clone antibody treatment monthly by IV meds of approximately $1400 to $1500 per month just to keep her from having recurrent spells of anaphylaxis and asthma. Patient was steroid dependant and is still dependant on multiple nebulizer treatments and multiple meds. She is the worst asthma patient that Dr. Goetz and I have ever treated. Ms. Kuhn desaturates by speaking in one or two sentences and also going up one flight of stairs as indicated by her blood count. She barely can compensate herself renally from her severe respiratory acidosis, which she was with on a regular basis. She cannot sustain climate changes or any other conditions that my trigger her asthma. She could really not perform any type of eight-hour day of work on a regular basis. I support her total disability.

(Plaintiff's supplemental exhibit).

At the Administrative Hearing, held on March 16, 2005, Plaintiff testified that she last had her Xolair in January. She said Xolair helped " a little bit but so far not that much." She "became sick" every couple of months with shortness of breath, tightness in the chest, wheezing, and weakness for a few weeks each time (R. 39). She testified she used her nebulizer three times a day– first thing in the morning, mid-afternoon, and then evening (R. 43). When she was sick she would use it every four hours.

Plaintiff testified that her only activities when she was not sick were two or three loads of laundry and maybe cooking supper (R. 44). She did not do household chores – her 13 year old daughter did them. When she was sick her activities were "Zero" (R. 45).

Plaintiff testified she could not work because she would "miss a lot of work" and did not feel it was "fair to a company to not always be there not knowing when I'm going to be able to be there" (R. 47).

The ALJ asked the VE if there would be any jobs available in the national and local economy

for an individual of Plaintiff's age, experience, and education, at the light and sedentary exertional levels with the following additional limitations: a sit/stand option; no climbing and other posturals only occasionally; no temperature extremes, humidity, dampness, environmental pollutants or hazards; and in a low-stress environment with no production line type pace or independent decision-making responsibilities (R. 50-51).

The VE testified that there would be a significant number of jobs available to the hypothetical individual at both the light and sedentary exertional levels (R. 51). The jobs would not be sustainable if the individual were off-task for one unscheduled hour per day and/or missed two weeks of work every two months (R. 52).

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ made the following findings:

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant's asthma and depression/anxiety are "severe" impairments, based on the requirements in the Regulations (20 CFR §§ 404.1520and 416.920.)

4. This medically determinable impairment [sic] does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6. The claimant has the following residual functional capacity: is able to perform a range of light work; requires a sit/stand option; should do all

16

walking on level surfaces; can perform postural movements occasionally, except cannot do any climbing; should not be exposed to temperature extremes, environmental pollutants or hazards; should work in a low-stress environment with no production line type of pace or independent decision-making responsibilities.

7. The claimant is unable to perform any of her past relevant work (20 CFR §§ 404.1565 and 416.965).

8. The claimant is a "younger individual between the ages of 18 and 44" (20 CFR §§ 404.1563 and 416.963).

9. The claimant has a "high school education" (20 CFR §§ 404.1564 and 416.964).

10. The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 CFR §§ 404.1568 and 416.968).

11. The claimant has the residual functional capacity to perform a significant range of light work (20 CFR §§ 404.1567 and 416.967).

12. Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.21 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include work as a mail room clerk (152,000 nationally and 365 within the local area); an office helper (132,000 nationally and 350 within the local area); an entry-level general office clerk (300,000 nationally and 1100 within the local area); or a laundry folder (48,000 nationally and 300 within the local area). The vocational [sic] was also able to identify work at a sedentary level that a person with the same residual functional capacity could perform. The vocational expert further testified that the above-cited jobs were consistent with the Dictionary of Occupational Titles and his experience (SSR 00-4p).

13. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(g) and 416.920(g)).

(R. 21-22).

## IV. Contentions

A. Plaintiff contends the ALJ erred by not giving the appropriate weight to either of her

two treating physicians' medical reports regarding her asthma:

1. The ALJ erred when he determined that Dr. Clarke was not a treating physician and that his opinions did not have to be accorded the same weight as other treating physicians;

2. The ALJ erred when he failed to give controlling weight to the opinions of Drs. Clarke and Goetz concerning Shelby's functional limitations; and

3. Even if not entitled to controlling weight, the ALJ erred by giving little to no weight to the medical opinions of Drs. Clarke and Goetz.

B. Defendant contends the ALJ correctly concluded that Plaintiff was not disabled:

1. Dr. Goetz's February 2005 opinion that Plaintiff's asthma was poorly controlled was not supported by Dr. Goetz's own treatment notes.

2. The ALJ properly discounted Dr. Clarke's opinion that Plaintiff could not work eight-hour days on a regular basis;

3. Neither treating physician opinion is supported by the objective medical evidence; and

4. Both treating physician opinions were also inconsistent with the opinions of two state agency physicians.

## V. Discussion

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (citing Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit stated substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less

than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" <u>Shively v. Heckler</u>, 739 F.2d 987, 989 (4th Cir. 1984)/(quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Treating Physician Opinions

Plaintiff argues that the ALJ erred by not giving the appropriate weight to either of her two treating physicians' medical reports regarding her asthma. Her argument is threefold: 1) the ALJ erred when he determined that Dr. Clarke was not a treating physician and that his opinions did not have to be accorded the same weight as other treating physicians; 2) the ALJ erred when he failed to give controlling weight to the opinions of Drs. Clarke and Goetz concerning Plaintiff's functional limitations; and 3) even if not entitled to controlling weight, the ALJ erred by giving little to no weight to the medical opinions of Drs. Clarke and Goetz.

The undersigned first notes the following two sentences from the ALJ's Decision:

> In July 2004, Dr. Clarke stated that the claimant could not go to work and stress herself or she would get very short of breath. <u>Considering that Dr. Clarke is not even the claimant's treating physician for asthma</u>, the Administrative law judge believes that this problem can be accommodated by limiting the claimant to working in only low-stress environments.

(R. 19). The undersigned agrees with Plaintiff that the ALJ erred in finding Dr. Clarke was not her treating physician for asthma. Although Dr. Clarke would best be referred to as Plaintiff's "primary care physician," the record clearly shows he treated Plaintiff regularly for several years for her

19

asthma. He referred Plaintiff to Dr. Goetz, an allergist/immunologist, but worked in concert with

him concerning Plaintiff's allergies and asthma treatment.

The Fourth Circuit has held: "Although it is not binding on the Commissioner, a treating

physician's opinion is entitled to great weight and may be disregarded only if persuasive

contradictory evidence exists to rebut it." Craig v. Chater, 76 F. 3d 585, 589 (4th Cir. 1996). The

treating physician's opinion should be accorded great weight because "it reflects an expert judgment

based on a continuing observation of the patient's condition over a prolonged period of time."

Mitchell v. Schweiker, 699 F.2d 185 (4th Cir. 1983).

The Fourth Circuit also held, however:

Circuit precedent does not require that a treating physician's testimony "be given
controlling weight." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20
C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,

[i]f we find that a treating source's opinion on the issue(s) of the
nature and severity of [the] impairment(s) is well supported by
medically acceptable clinical and laboratory diagnostic techniques
and is not inconsistent with the other substantial evidence in [the]
case record, we will give it controlling weight.

By negative implication, if a physician's opinion is not supported by clinical evidence
or if it is inconsistent with other substantial evidence, it should be accorded
significantly less weight.

Craig, supra.

Although the undersigned finds Dr. Clarke and Dr. Goetz were both treating physicians, their

opinions that Plaintiff was "disabled" or "unable to work" are not entitled to controlling weight,

because those opinions concern issues reserved to the Commissioner. 20 CFR 404.1527(e) provides:

(e) *Medical source opinions on issues reserved to the Commissioner.*
Opinions on some issues, such as the examples that follow, are not
medical opinions, as described in paragraph (a)(2) of this section, but
are, instead, opinions on issues reserved to the Commissioner because
they are administrative findings that are dispositive of a case; *i.e.,* that

20

would direct the determination or decision of disability.

> (1) *Opinions that you are disabled.* We are responsible for making the determination or decision about whether you meet the statutory definition of disability. In so doing, we review all of the medical findings and other evidence that support a medical source's statement that you are disabled. A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled.

> (2) *Other opinions on issues reserved to the Commissioner.* We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to this subpart, your residual functional capacity (see §§404.1545 and 404.1546), or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

On January 22, 2004, Dr. Clarke noted Plaintiff had not quit her job but had not "really been to work because she is totally disabled." He noted that disability "was advised" by both he and Dr. Goetz.

On September 3, 2004, Dr. Clarke noted that he "supported federal disability."

On February 8, 2005, Dr. Clarke wrote a letter to Plaintiff's counsel, stating that Plaintiff "could really not perform any type of eight-hour day of work on a regular basis" and that he "support[ed] her total disability."

All these opinions are on issues reserved to the Commissioner and are therefore not entitled to controlling weight. This does not end the discussion, however.

Even if not entitled to controlling weight, a treating physician's opinion is still entitled to consideration pursuant to the factors listed in 20 CFR 404.1527(d), which provides, in pertinent part:

> When we do not give the treating source's opinion controlling weight,

we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

> (i) *Length of the treatment relationship and the frequency of examination.* Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

> (ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

> (3) *Supportability.* The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. . . .

> (4) *Consistency.* Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

As already stated, Drs. Clarke and Goetz are both treating physicians, and both have a fairly long treating relationship with Plaintiff regarding her allergies and asthma. Factors 2(d)(i) and (ii) both therefore weigh in favor of Plaintiff. The ALJ, however, found that the doctors' opinions were not supported by the evidence and were inconsistent with the record, noting the objective findings of mild impairment, evidence of reversibility, indications of improvement with Xolair, and Plaintiff's own report of daily activities. He also noted Dr. Goetz's statement that Plaintiff's asthma was in

22

poor control in February 2005, despite finding in December 2004 that she had had no asthma problems in the past 20 days and only occasionally used her albuterol inhaler; and his blaming of the poor control on "sporadic administration" of Xolair, where in December he had noted that Plaintiff's adherence to Xolair schedule had been in compliance with his instructions.

A review of the evidence indicates that Plaintiff saw Dr. Goetz in May 2003, after an 18-month absence. This is only four months prior to her alleged onset date. At that time she reported a "recent asthma exacerbation." She was "having wheezing, coughing intermittently" but was notably not on full doses of any of her medications. The doctor encouraged full compliance with her meds. Two months later (and two months before Plaintiff stopped working), Dr. Goetz reported that Plaintiff's asthma was "again at her previous best on medications." At this time, Plaintiff was working at a job where she was required to walk 8 hours a day, stand 8 hours a day, climb 1-2 hours a day, lift 50 pounds, unload trucks, clean with strong chemicals, work in extreme temperatures, cook, and work with the public.

One month after quitting work, Plaintiff reported a "recent asthma exacerbation associated with acute sinusitis." The doctor noted she was recovering slowly, but had significant improvement with Foradil.

On December 26, 2003, three months after she stopped working, Plaintiff reported she had three young daughters and had to "take care of their everyday needs." She could not take naps in the daytime, stating: "I can't. I have a 26 month old I have to care for." She did all the shopping, prepared full meals for a family of five, did all the laundry, vacuumed, dusted, cared for the children, mopped the floors, washed the dishes, and ran the errands. The children helped pick things up and run the sweeper "some," and her husband tried to help but was "usually at work." When the children

went to bed it left her "to see that all gets done." She stated that she could not work even part time "and take care of [her] family full time."

Less than one month later, Dr. Clarke opined that Plaintiff was "totally disabled." On that date Plaintiff had reported no symptoms except sinus congestion. She was still tired going up and down stairs, but her lungs had been "somewhat stable." The doctor noted her lungs were "better than usual."

In February 2004, Plaintiff was "maintaining" despite not being able to start on Xolair. She had not had to use steroids.

By March 2004, however, Plaintiff reported to SSA that she could no longer do any housework and that her husband and children had to do everything. Yet on March 17, her pulse ox was 96% and her breathing was non-labored. In early April, still not having started on her new medication, Plaintiff had improved PFT's. In May Plaintiff reported "an exacerbation" while at a church function (in a "new church") with her daughter. It lasted "a few hours" and required "a couple of" nebulizer treatments but then went away and she'd been "feeling fine ever since." The doctor noted she had gotten over the exacerbation without steroids. On examination, Plaintiff's lungs had no wheezing or crackles. Later that month, Plaintiff's asthma was "somewhat more problematic with occasional use of Albuterol, and an occasional cough with no wheezes, rales or rhonchi."

In June 2004, Plaintiff was "doing much better now that she remains off work." The Xolair was improved her breathing "a lot." Her breathing was "somewhat better" as was her stamina. Lungs were somewhat improved. Dr. Goetz found Plaintiff was "stable" with occasional cough, occasional use of Novotril, and no cough, wheezes or rales or rhonchi on exam. Later that month

24

Plaintiff reported she could tolerate cats at a relative's home. She had no cough, no wheezes, rales or rhonchi, and her clinical symptoms had improved.

In July, Plaintiff's resting breathing had "really improved." She had not had a severe exacerbation. Xolair was decreasing her triggers. Yet Dr. Clarke found she "really cannot go to work and stress herself or she will get very short of breath," and opined she was totally disabled. Later that month, Plaintiff was still tolerating cats in her environment, had no wheezes, rales or rhonchi, and still had had no exacerbation. Dr. Goetz found suggestions of improvement in allergies and asthma and the "Best PFT's in 2 years!" (Plaintiff had stopped working only 10 months earlier).

Two months later, and still within the 12 months' durational requirement, Plaintiff reported "shortness of breath for the last 2 days with lots of drainage." She had wheezing and decreased breath sounds. She had not been on Xolair for nearly a month. Dr. Goetz stated he supported "federal disability."

Despite being off Xolair for two months, Plaintiff's PFT's were stable and she had no cough, wheezes, rales or rhonchi in late October 2004. PFT's that day showed normal FVC and FEV1 with only "possible early obstructive pulmonary impairment" with "a mild degree of small airway disease and/or the earliest stages of emphysema."

In November, after missing a dose of Xolair, Plaintiff still had no wheezes rales or rhonchi, but her PFT's decreased back to "mild." By early December she was back on Xolair. In late December she had had "no asthma problems." She was on schedule with her injections. Plaintiff's Xolair was stopped in January 2005 because her insurance had "switched over" and she was trying to arrange financial assistance for the co-payments.

The undersigned finds the above evidence substantially supports the ALJ's determination that

25

Drs. Clarke's and Goetz's opinions that Plaintiff was" totally disabled" and could not perform "any type" of 8-hour work day on a regular basis are not supported by the record.

In addition, two State agency reviewing physicians opined that Plaintiff could work at the light exertional level with additional limitations. One expressly disagreed with the treating physician's opinion that Plaintiff was totally disabled. 20 CFR § 404.1527(f)(2)(i) provides, in pertinent part:

> Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists. However, State agency medical or psychological consultants, or other program physicians or psychologists, are highly qualified physicians and psychologists who are also experts in Social Security disability evaluations. Therefore, administrative law judges must consider findings of State agency medical or psychological consultants, or other program physicians or psychologists, as opinion evidence, except for the ultimate determination about whether you are disabled.

The ALJ therefore properly considered the opinions of the State agency physicians.

The record further indicates that Plaintiff's PFT studies routinely showed she was considered to have "mild" obstructive disease, even at times when she was without medication. At one point while on medication, the FVC and FEV1 were actually considered "normal," indicating only "early possible" disease.

Further, Plaintiff had worked a physically demanding job entailing heavy lifting, extreme temperatures, and exposure to chemical cleaners up until her onset date, despite having had "severe persistent asthma" since at least 2001. Her activities of daily living two months after she stopped working included doing all or nearly all the vacuuming, dusting, laundry, cooking, and shopping for a family of five, all activities that require exposure to dust, fumes, pollens, etc. Her husband smoked in the house. Once started on Xolair, Plaintiff exclaimed that could even tolerate cats in her

environment. These are all signs that Plaintiff's symptoms had lessened during the relevant time period, or at least had not worsened, as she alleges.

There is, as the ALJ found, substantial evidence that Plaintiff's condition significantly improved with use of Xolair. If a symptom can be reasonably controlled by medication or treatment, it is not disabling. Gross v. Heckler, 785 F.2d 1163 (4th Circ. 1986). At the administrative hearing, Plaintiff testified she had not had the Xolair in two months due to her insurance "switching over." She was working on getting financial assistance with the co-payment. A claimant may not be penalized for failing to seek treatment she cannot afford; "[i]t flies in the face of the patent purposes of the Social Security Act to deny benefits to someone because he is too poor to obtain medical treatment that may help him." Gordon v. Schweiker, 725 F.2d 231 (4th Cir. 1984). The undersigned notes, however, that Plaintiff began using Xolair in March 2004, continuing fairly regularly until January 2005, with the exception of about two months after she had the syncopal episode where it was temporarily suspended while doctors sought the cause. Apparently, Xolair was found not to be a cause of the episodes, which her treating physician attributed to stress and hyperventilation while yelling at her children for fighting. There is no evidence the temporary stopping of Xolair was due to financial difficulties. The Xolair was restarted in October 2004, and Doctor Goetz noted she was "on schedule" with treatment in late December. Even though the co-payment for the Xolair was significant (reportedly about $550.00), Plaintiff was not indigent, and has not shown she was "too poor" to obtain it, or that she had sought other avenues to obtain it other than her husband's employer's health insurance.

Even if it were determined, however, that Plaintiff could no longer afford the Xolair, the undersigned notes that during the two months in 2004 that Plaintiff was without the medication her

undersigned notes that during the two months in 2004 that Plaintiff was without the medication her PFT's remained stable, she had no cough, wheezes, rales or rhonchi, and her FVC and FEV1 were normal.

Substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984). Under that definition, the undersigned finds substantial evidence supports the ALJ's determination that Dr. Goetz's and Dr. Clarke's opinions were not entitled to significant weight. The undersigned therefore also finds that the ALJ's error in determining Dr. Clarke was a non-treating physician for asthma is harmless, because, regardless of Dr. Clarke's status as a treating physician, substantial evidence supports the finding that his opinion was not entitled to significant weight. The result would therefore be the same.

For all the above reasons the undersigned finds substantial evidence supports the ALJ's determination that Plaintiff was not disabled at any time through the date of his decision.

## VI. RECOMMENDATION

For the reasons herein stated, I find that substantial evidence supports the Commissioner's decision denying Plaintiff's applications for SSI and DIB. I accordingly recommend Defendant's Motion for Summary Judgment [D.E. 11] be **GRANTED**, Plaintiff's Motion for Summary Judgment [D.E. 10] be **DENIED**, and this matter be dismissed from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy

of such objections should also be submitted to the United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 22 day of December, 2006.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE